# United States Tax Court

T.C. Memo. 2025-29

KALEB J. PIERCE,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket No. 24786-18.                    Filed April 7, 2025.

————

*Kasey J. Schlueter*, *Carol Warnick*, *Matthew E. Wright*, *Susan L. Combs*, and *William F. Colgin, Jr.*, for petitioner.

*Benjamin S. Bywater*, *Skyler K. Bradbury*, *Bryant W. Smith*, *Rebekah A. Myers*, and *Justin R. Forti*, for respondent.

## MEMORANDUM FINDINGS OF FACT AND OPINION

GREAVES, *Judge*: The Internal Revenue Service (IRS or respondent) determined against petitioner a federal gift tax deficiency for the 2014 tax year. In 2014 petitioner and his now ex-wife (Ms. Bosco) each gave a 29.4% interest in their business Mothers Lounge, LLC (Mothers Lounge), to two irrevocable trusts and sold a 20.6% interest in Mothers Lounge to a limited liability company owned by the irrevocable trusts. After concessions, the issue before the Court is the proper value of these interests for federal gift tax purposes.

## FINDINGS OF FACT

The parties filed four stipulations of fact with accompanying exhibits that are incorporated by this reference. Petitioner lived in Utah when the petition was filed. In 2014 Mothers Lounge was an S corporation for federal tax purposes.

[*2]    Backstabbing, infidelity, and blackmail—not the first words that come to mind in relation to a baby products company.  However, these words aptly describe Mothers Lounge in the years leading up to June 4, 2014 (valuation date).  To understand the valuation of Mothers Lounge, we must first explore the history of the company and the husband-and-wife team that led the business for years.

I.    *Always Out for a Quick Buck*

In his own words, petitioner "never imagined that [he] was going to be this successful."  Beginning at an early age, petitioner sought to make money in any way he could.  This desire often led to less than traditional career choices.  Petitioner launched his first business at age 16 when he purchased an ice cream truck.  He operated an ice cream business until age 21, forgoing a formal college education in favor of practical experience.  He met Ms. Bosco and the two married in 2000 with several children soon following.

With more mouths to feed, petitioner looked to less savory businesses to make a quick buck.  Petitioner took a position with a timeshare company, where he focused on placing advertisements in high traffic areas such as shopping malls.  Petitioner did not stay in this position long as he felt the familiar call of entrepreneurship.  At this time, timeshare companies primarily advertised in shopping malls, but not in the movie theaters often attached to the shopping malls.  Petitioner saw an opportunity to expand timeshare advertising to the movie theaters and leverage the theater foot traffic.  He and Ms. Bosco created a business that connected the timeshare sellers with the movie theaters.

A recession dried up this business, and petitioner struggled to support his family.  Petitioner shifted his focus to odd jobs, including helping his friend paint a house.  This one-off job for a friend unlocked petitioner's next business idea: a house painting business.  Petitioner posted advertisements on Craigslist for his house painting services, which led to moderate success in obtaining work.  But finances were still tight with the family subsisting on rice and beans.  Petitioner was eager to find another source of income.

In 2005 petitioner and Ms. Bosco were caught up in the excitement and exhaustion of adding a new child to the family.  Ms. Bosco breastfed the baby around the clock, and she would often forget which side she had most recently fed the baby from.  One day while

[*3] breastfeeding, Ms. Bosco twirled a yellow rubber bracelet on her wrist. Inspiration struck: The solution to her forgetfulness was a bracelet with one side that read "Left" and on the other side that read "Right." The nursing mother could then flip the bracelet to the side that she most recently breastfed from. The next time she fed the baby, she would have a reminder of which breast to use.

Ms. Bosco pitched this idea to petitioner, and he instantly saw his next business opportunity. Petitioner reached out to manufacturers in China, and soon petitioner and Ms. Bosco had bracelets, which they named Milk Bands, to sell. The pair created the business entity Milk Bands, LLC, to sell the bracelets directly to consumers through a website. In addition to direct-to-consumer sales, petitioner and Ms. Bosco set up a booth at wholesale tradeshows. Their booth was placed in an area that catered to breastfeeding and related products. Despite the success of nearby booths, Milk Bands, LLC, did not draw the crowds that petitioner and Ms. Bosco had envisioned. This left a lot of time at these tradeshows to sit and watch other baby products have the success they could only dream of.

One of the most successful booths at the tradeshows featured a product called Hooter Hiders, a nursing cover sold by Hooter Hiders, LLC. Petitioner and Ms. Bosco watched envious for years as Hooter Hiders, LLC, found the success they desired. Frustrated by a lack of business and hoping to ride Hooter Hiders, LLC's coattails, petitioner crafted his next business idea: create an identical nursing cover to knock off Hooter Hiders. After an extensive search, petitioner determined that Hooter Hiders, LLC, sold Hooter Hiders for $34.95 retail and from $15 to $17 wholesale. Petitioner reached out to manufacturers in China and discovered that the cost to manufacture a similar nursing cover was approximately $1.30. Most importantly, petitioner discovered that Hooter Hiders, LLC's patents on Hooter Hiders had expired. Hooter Hiders, LLC, claimed to have additional patents pending, but petitioner assumed the patents would be denied because they were identical to the expired patents. Petitioner purchased the domain name UdderCovers.com for a couple of dollars around 2008 and with this plan in hand, petitioner and Ms. Bosco simply needed time and money to launch their next venture.

Petitioner and Ms. Bosco continued to attend tradeshows, marketing their failing product Milk Bands. Shortly after purchasing the UdderCovers.com domain name, petitioner and Ms. Bosco attended the Orlando wholesale tradeshow and met the owners of Hooter Hiders,

[*4] LLC, another husband-and-wife team. The two couples shared meals, and, on the surface, a budding friendship started to form. But knocking off Hooter Hiders with Udder Covers was always present in petitioner's mind. Six months later, petitioner saw an opportunity to capitalize on this friendship and make Milk Bands the successful product he had always wanted. He called his new friends and asked them to add a link to Milk Bands, LLC's website on Hooter Hiders, LLC's website to hopefully boost business. Petitioner had prominently displayed an endorsement of Hooter Hiders on Milk Bands, LLC's website for years, and he hoped that Hooter Hiders, LLC, would return the favor. The owners of Hooter Hiders, LLC, rejected this proposal. Petitioner felt betrayed, and his plan to knock off Hooter Hiders was cemented.

Around a year after buying the domain name, petitioner raised enough money to launch Udder Covers. He renamed his business from Milk Bands, LLC, to Mothers Lounge, creating a new website where people could buy Udder Covers and Milk Bands. By this time the nursing cover market was saturated with traditional businesses having widespread success in retail stores. Petitioner attempted to differentiate Udder Covers by selling on eBay but had little success.

Not discouraged, petitioner began running more unique business models past friends and family. He ultimately settled on a plan that would be the model for all future products. Udder Covers would sell products on the Mothers Lounge website with prices listed equal to those of Hooter Hiders. Udder Covers would then flood the market with promotional codes that would reduce the price to $0. This meant that a customer would pay only a shipping fee of $7.95 for the product.

The natural question with this business plan is how does Mothers Lounge make money—particularly when petitioner paid $1.30 to manufacture each Udder Cover? On the surface, Mothers Lounge should be losing money on Udder Covers. Instead, it was a successful business. The answer lies in the shipping cost and the "free, just pay shipping" business model. Customers paid $7.95 for shipping, while Mothers Lounge paid only $1.57 to ship the product, which is the cost to ship a product weighing less than a pound. This inflated shipping price covered actual shipping cost and cost of goods sold and still left room for a healthy profit. The key to this business model was setting a shipping price that a customer would believe represented the actual cost of shipping.

[*5] II.   *Overnight Success and Development of a Business Model*

The new Mothers Lounge website went live in 2009.  To promote Udder Covers, petitioner purchased a Google advertisement that included a promotional code for a "free" Udder Cover.  This advertisement resulted in only seven orders on the first day.  Sometime overnight, the promotional code was placed in a comment section of a "money saving" website.  The next morning sales flooded in with over 400 orders before the website crashed on account of traffic.  Once petitioner purchased more bandwidth, the sales continued with 1,827 orders on the second day and 1,500 orders on the third day.

That first month was not all roses.  As soon as Mothers Lounge fulfilled orders, it received negative feedback.  Unbeknownst to petitioner, the packages were stamped with the actual shipping cost.  Customer after customer called requesting a refund for the difference between the actual shipping cost and what they paid Mothers Lounge.  Mothers Lounge denied these requests.  Within two weeks of the launch, more than 52,000 websites were calling Udder Covers a scam.

Despite the customer service issues, the short-term success of Udder Covers solidified the business plan for Mothers Lounge to knock off successful products.  Petitioner developed a formula to follow when selecting the next target: (1) the retail price for the name brand product was over $30, (2) the product weighed less than one pound, and (3) the product could be manufactured for under $3.  Mothers Lounge specifically looked for products that had an established name brand company that it could use as a "punching bag."  That is, Mothers Lounge used this name brand product to promote the value in its own product.  Petitioner and Ms. Bosco continued to attend tradeshows, not to promote a product but rather to discover which products buyers purchased.  Applying their formula to the popular items sold at the tradeshows, petitioner and Ms. Bosco would decide which product to manufacture and sell next.

After they selected a product and the manufacturer began production, Mothers Lounge created a website for the product with a domain name composed of generic terms that would be easy for a search engine to find and difficult for consumers to research.  Mothers Lounge then flooded the internet with promotional codes for the free products.  Mothers Lounge did not invest any additional capital into developing its brands beyond distribution of the promotional codes.  Mothers Lounge then sat back and watched the sales roll in.

**[*6]**    Once Mothers Lounge entered a specific product market, it attracted competition.  Competitors realized that Mothers Lounge sold products made with poor materials but had high returns.  To win customers, competitors brought to market superior products, manufactured at costs slightly above those of Mothers Lounge and priced the superior products for less than the inflated shipping cost.  This would result in declining sales for Mothers Lounge and focus would turn to the next knockoff product.

Mothers Lounge's free, just pay shipping business model targeted a niche portion of the maternity market: first-time mothers that wanted the lowest price.  Specifically, Mothers Lounge capitalized on the new mother's lack of knowledge regarding the maternity market and product quality.  Mothers Lounge attempted to find these mothers as early as possible in pregnancy before they had an opportunity to research brands in the baby industry.  When a new mother in her first trimester encountered a Mothers Lounge advertisement, the conversion rate was high.  By the second and third trimester, the conversion rate declined.  Sales picked up again during the first three months of a baby's life.  After this period, sales were infrequent because most of the products were for mothers with newborns.  Because of this declining conversion rate, Mothers Lounge focused on baby stores rather than general children stores.

Mothers Lounge designed simplistic customer-facing websites to make sales directly to consumers.  The typical consumer did not seek out Mothers Lounge but instead stumbled upon a promotional code for a specific product on a website or in the retail bags from a maternity store.  For example (and discussed in greater detail below), Mothers Lounge contracted with Destination Maternity to include a promotional code in each customer's shopping bag.  These promotional codes offered customers a free item or gift card for the entire retail value.

Upon finding a promotional code, a customer would go to the product's website listed on the advertisement.  She then would add the item to her cart and enter the promotional code found on the advertisement on the first checkout page.  The next webpage asked for extensive personal information such as the customer's shipping address, email address, and phone number.  It would only be after entering all this information that the last webpage listed the shipping price of the item. Mothers Lounge designed this process to capitalize on the sunk cost fallacy in that customers were more likely to enter their credit card information after filling out all the previous information.  If a customer

[*7] was dissatisfied with a product, as many were because of the poor quality of the products, Mothers Lounge did not offer a return policy except in the event of defects.

III.    *Products and Subsidiaries*

Mothers Lounge followed a nearly identical business model for each of the products it knocked off. Mothers Lounge sold each product from a different subsidiary on a separate website to give the appearance that the companies were not connected. This separation of the businesses was vital to the free, just pay shipping model because Mothers Lounge needed to charge the "shipping" price for each product to make a profit. Even with a separate business selling each product, some customers discovered the products were sold by the same company. These customers frequently requested that the company send the two products together to save on shipping and handling. Mothers Lounge denied these requests, which often damaged the customer relationship. Under these separate business models, only 20% of customers purchased a product from a different subsidiary. As of the valuation date, 97% of the company's revenue came from the free, just pay shipping model.

Mothers Lounge derived a small portion of its income from wholesales made at tradeshows. The dominance of Mothers Lounge's free, just pay shipping model soured most relationships with wholesalers. Unsurprisingly, wholesalers did not want to buy for resale products that Mothers Lounge advertised as free.

We highlight below the relevant facts related to each subsidiary and product. Unless otherwise specified, Mothers Lounge followed the same free, just pay shipping model described above. Mothers Lounge launched three products via separate subsidiaries in 2010, one in 2011, three in 2012, and two in 2013. As of the valuation date Mothers Lounge had not launched any new products in 2014, nor were there any products in development. We will refer to the products collectively as Mothers Lounge products.

A.    *Milk Bands, LLC*

On June 16, 2010, petitioner formed Milk Bands, LLC, to sell Milk Bands. Mothers Lounge applied for two trademarks before the valuation date: "MILK BANDS" and "MILK BANDS SINCE 2005." Both trademarks were granted on March 24, 2015.

**[\*8]**   B.    *Udder Covers, LLC*

On June 16, 2010, Mothers Lounge formed Udder Covers, LLC, to sell its nursing cover. Mothers Lounge filed two trademarks before the valuation date related to the product Udder Covers: "Udder Covers for Nursing Mothers" and "Est. 1994 Udder Covers for Nursing Mothers." Both trademarks were granted on March 24, 2015.

C.    *Seven Slings, LLC, and Hotslings, LLC*

On June 14, 2010, Mothers Lounge formed Seven Slings, LLC, to sell its baby carrying sling product. Mothers Lounge designed the product Seven Slings to knock off a popular baby sling sold under the brand name Hotslings. Seven Sling, LLC's first sale was August 25, 2010. Mothers Lounge did not hold any patents or trademarks associated with the product Seven Slings.

While Mothers Lounge did the legwork to get Seven Slings, LLC, up and running, its punching bag company, Hotslings, Inc., ceased operations. Mothers Lounge took the opportunity to acquire all the assets of Hotslings, Inc., and create a new subsidiary, Hotslings, LLC, to hold the assets, including the trademark "HOTSLINGS."

Mothers Lounge stepped into the traditional business model and attempted to sell high quality products at retail cost through the Hotslings, LLC, website. Hotslings, LLC, regularly ran sales, offering customers between 15% and 50% off the purchase of an item. Mothers Lounge did not have any success with this traditional business model with Hotslings, LLC, accounting for less than 1% of Mothers Lounge's income. Even though Hotslings, LLC, generated little revenue, Mothers Lounge found a use for the company. In an unusual move, Mothers Lounge continued to operate the failing company Hotslings, LLC, to act as a punching bag for Seven Slings, LLC.

D.    *Carseat Canopy, LLC*

On March 24, 2011, Mothers Lounge formed Carseat Canopy, LLC, to market and sell its baby car seat covers. Carseat Canopy, LLC, made its first sale on November 9, 2011. Mothers Lounge filed a trademark application for "Carseat Canopy We've Got Your Baby Covered" on August 28, 2013. The trademark was granted in 2015.

**[\*9]**     E.     *Baby Leggings, LLC*

On November 12, 2012, Mothers Lounge formed Baby Leggings, LLC, to market and sell its baby leggings. Baby Leggings, LLC's first sale was August 2, 2013. Mothers Lounge did not own any patents or trademarks related to Baby Leggings, LLC.

F.     *Rufflebuns, LLC*

On November 13, 2012, Mothers Lounge formed Rufflebuns, LLC, to market and sell its baby diaper covers. Rufflebuns, LLC, made its first sale on May 27, 2014. Mothers Lounge did not have any patents or trademarks related to Rufflebuns, LLC.

G.     *Nursing Pillow, LLC*

On November 14, 2012, Mothers Lounge formed Nursing Pillow, LLC, to market and sell its baby nursing pillow. Nursing Pillow, LLC, made its first sale on February 4, 2013. Mothers Lounge did not have any patents or trademarks related to Nursing Pillow, LLC.

H.     *Belly Button, LLC*

On June 19, 2013, Mothers Lounge entered an asset purchase with Fran Co. Products to purchase all rights, title, and interest in its maternity waistband product, Belly Button. Mothers Lounge formed Belly Button, LLC, as a holding company for these assets including the ability to market and sell products as "Belly Button" and "Little Missy Design." Mothers Lounge also received a patent in the asset purchase. Mothers Lounge did not hold any trademarks related to this product. Belly Button, LLC, made its first sale on July 15, 2013.

I.     *Breast Pads, LLC*

On November 5, 2013, Mothers Lounge formed Breast Pads, LLC, to sell reusable breast pads. Mothers Lounge did not own any patents or trademarks related to this product. Breast Pads, LLC, made its first sale on November 14, 2013.

IV.     *Operations*

Petitioner was the chief executive officer and co-owner of Mothers Lounge. He handled the day-to-day operations of Mothers Lounge as

[*10] well as the business side of new product launches, including screening new product ideas and finding marketing channels.

Petitioner co-owned Mothers Lounge with Ms. Bosco, the creative brains of the operation. Ms. Bosco was the primary source for new products, constantly on the hunt for the next big thing. When she found an interesting product, she pitched it to petitioner, who then applied the formula for new products as described above. If the product met the criteria, Mothers Lounge had its next product. Not every product Ms. Bosco pitched was a winner. In fact, petitioner often rejected her ideas in strictly applying the formula. After petitioner approved a product, Ms. Bosco hosted a product photo session, designed the website, and worked with the manufacturer to replicate the name brand product as closely as possible. She also worked with a graphic designer to design all the print advertising.

Petitioner and Ms. Bosco did not operate Mothers Lounge alone. The pair looked to petitioner's brother Benjamin Pierce, who had a formal education in business management, for support. Benjamin managed the supply chain logistics of the company, including shipping, packaging, and warehousing. He also managed the limited customer service team.

V.  *Marketing*

Mothers Lounge grouped its advertising efforts into marketing programs, which focused on channels of communication including magazines, in-store advertising in maternity stores, and social network advertising through affiliates. Within each marketing program, Mothers Lounge developed targeted marketing campaigns for each advertisement. For example, Mothers Lounge created a marketing program called TipsNTrends to target magazines with a specific advertisement. Each magazine was assigned a different marketing campaign. As of the valuation date, Mothers Lounge had 450 marketing campaigns.

Despite the nontraditional business model, Mothers Lounge was an extremely data-driven company. Mothers Lounge gave each marketing campaign a unique promotional code that it used to monitor each campaign's success. Petitioner constantly monitored these data points to determine which campaigns to discontinue.

While Mothers Lounge embraced technology in its marketing campaigns, it rejected the industrywide push towards social media.

[*11] From the company's start in 2005, management knew that customer reviews and open-forum comments hurt the business because of the cheap product quality and deceptive business model. The big retailers in the industry often hosted forums where customers could ask each other questions. Many of these early forums contained mixed posts about the Mothers Lounge products. Half of the posts noted that the products were a good deal for the shipping price and the other half labeled Mothers Lounge a scam. Criticism focused on the inferior quality of the products as compared to the name brands, the deceptive shipping price, and the lack of a return policy.

This early negative experience tainted Mothers Lounge's view of social media and led to a continued rejection of social media as an advertising platform. Mothers Lounge did not want to create an opportunity for customers to comment on the products, especially in a highly visible location such as a social media advertisement. However, as customers became more social media savvy, many viewed Mothers Lounge's subsidiaries' lack of social media presence as an indication that the business was a scam. Reluctantly, Mothers Lounge created basic Facebook pages for each of the subsidiaries that it closely monitored to respond to any negative reviews.

We explain the three largest marketing programs in further detail below: the Destination Maternity marketing program, the in-house marketing program, and the affiliate marketing program.

A.    *Destination Maternity Marketing Program*

As of the valuation date, the Destination Maternity Marketing Program was Mothers Lounge's largest marketing program. Destination Maternity is a nationwide, publicly traded retailer of mother and baby products. Destination Maternity carried instore and online maternity belly bands, nursing products, and maternity wear. Though the company had success through October 2013, it experienced declining stock value around the valuation date. In 2010 Mothers Lounge contracted with Destination Maternity through its advertising consultant company Target Media for a marketing program consisting of five campaigns: emails, in-store, in-store and online shared, online, and catalog. The in-store campaign required Destination Maternity to include a Mothers Lounge product coupon in a customer's shopping bag at checkout. This in-store campaign of all the Destination Maternity campaigns generated the most revenue for Mothers Lounge.

**[*12]** Mothers Lounge did not have the same success with the other Destination Maternity marketing campaigns. For example, Mothers Lounge saw a low conversion for the catalog campaign, where Destination Maternity included a Mothers Lounge product coupon in a monthly magazine. Mothers Lounge attributed this to the fact that Destination Maternity sent these magazines largely to the same subscribers each month.

Mothers Lounge paid three cents per advertisement that Destination Maternity handed out. The advertising contract covered a one-year period, and the parties renewed it annually. Either party could cancel the contract at any time. The contract required Mothers Lounge to take all necessary actions to resolve customer complaints. The contract rested on Destination Maternity's incorrect belief that Mothers Lounge was primarily a wholesaler. To maintain this appearance, Mothers Lounge had to continually attend wholesale tradeshows.

Although this relationship was lucrative for Mothers Lounge, uncertainties threatening the relationship rested just below the surface. Soon after the partnership began, Destination Maternity received complaints about the quality of Mothers Lounge's products. In accordance with the contract, Destination Maternity communicated these complaints to Mothers Lounge. Although Mothers Lounge quickly responded to these complaints, petitioner was particularly concerned that these complaints would attract unwanted scrutiny of the contract. Mothers Lounge theorized that even a cursory review of the contract would reveal that Mothers Lounge was a direct competitor to Destination Maternity, often giving away coupons for free versions of similar products Destination Maternity sold in store. Although no one at Destination Maternity expressly told Mothers Lounge that it was considering terminating the contract, Mothers Lounge suspected that it was a matter of time before it lost this lucrative marketing program.

Given this fear, Mothers Lounge complied with all of Destination Maternity's demands, no matter the cost. This included continuing to pay for monthly email blasts to Destination Maternity's listservs, even though the conversion rates on these emails were low.

B. *In-House Marketing Program*

Mothers Lounge focused its in-house marketing program on email blasts to its internal listserv of prior customers. As with many Mothers Lounge marketing programs, the company found initial success, but as

**[\*13]** time went on it became less effective. Sometime between 2012 and 2014, Google changed its algorithm to detect spam emails to flag every email that included the word "free" as spam. This significantly hindered Mothers Lounge's marketing efforts that hinged on advertising products as free. Mothers Lounge altered the text of its emails; but as soon as it found a way to avoid the spam filter, Google updated its algorithm to block the new email. Yahoo and AOL soon followed suit, resulting in the emails' reaching even fewer customers.

C.    *Affiliate Marketing Program*

Mothers Lounge's final major marketing program was the affiliate marketing program. Mothers Lounge offered individuals, known as affiliates, the opportunity to earn money by sharing a personalized code to friends and family for a free product. Each time a customer used the code, the affiliate would earn a set amount of the sale proceeds. To become an affiliate, a person need only fill out an application located on each subsidiary's website. Mothers Lounge had 150 affiliates to market its products. Of the 150 affiliates, one person generated most of the sales from the affiliate program. This affiliate succeeded because of his connection with a large baby formula manufacturer, who included coupons with his affiliate code in the finished formula packages.

Mothers Lounge sought to keep its top affiliate happy no matter the cost, including altering the affiliate compensation structure at the affiliate's request. Before the change, a customer entered an affiliate promotional code when checking out with one of the Mothers Lounge products. After completing the transaction, the order confirmation page displayed a promotional code for another Mothers Lounge product. The affiliate received compensation for the first sale but not the subsequent sale with the other subsidiary. After the change, Mothers Lounge linked the promotional code displayed on the order confirmation page to the affiliate, and the affiliate would earn compensation for both sales. This increased Mothers Lounge's costs associated with the affiliate marketing campaign but did not increase sales.

VI.    *Hitting a Rough Patch*

Despite the early success, Mothers Lounge approached the limitations of its business model in the year leading up to the valuation date. Leads for new products to knock off dried up, and management concluded that it had exhausted all the baby products that fit its product

[*14] formula.  As of the valuation date, Mothers Lounge had no new products in development.  In addition to these internal pressures, external market and personal pressures began disrupting Mothers Lounge's operations.

A.    *Amazon*

Amazon significantly disrupted Mothers Lounge's operations.  Around the valuation date, Amazon was growing into the largest online retailer.  Maternity products listed on Amazon quickly topped Mothers Lounge products on Google searches, which decreased traffic to Mothers Lounge's websites.  Mothers Lounge relied on beating competitors in price, but Amazon had the advantage here as well because of its economies of scale.  Amazon manufactured better quality products for a cheaper price than Mothers Lounge.  Amazon not only offered superior products but also better customer service.  Amazon offered free returns, employed a dedicated team of customer service employees, and offered prominently displayed price transparency.

Amazon also presented Mothers Lounge with a major opportunity for growth.  Amazon offered third-party fulfillment services where a retailer could list a product on Amazon, and Amazon shipped the product to customers via its distribution channels.  This provided companies the benefits of Amazon—free or reduced shipping and a great return policy—without the work of implementing these policies at a company level.  In exchange Amazon charged 20% to 30% of the proceeds.

The third-party fulfillment option was lucrative for many businesses, but the unique constraints from Mothers Lounge's business model shut it out from this opportunity.  As an unrecognized brand with poor quality products, Mothers Lounge could not list the price of its products on Amazon at the same price as the name brand product.  Thus, to succeed on Amazon, Mothers Lounge would have to reduce the list price of its products significantly.  It could not, however, make a corresponding list price reduction on the subsidiary website.  The free, just pay shipping model is based on customer perception of the "deal" being offered.  While a customer would take the required steps to purchase a product from an unknown website like Mothers Lounge for a product allegedly worth $35, she would not feel as inclined for a product valued at $8.  This lower price would also signal to consumers the difference in quality between the brand name products and the Mothers Lounge products.  The tension between the business models

[*15] would result in two different prices: the Amazon price and the subsidiary websites price. This would create an asymmetry where a customer sees the product for one price on the subsidiary websites and a significantly lower price on Amazon. The customer is then left questioning the product's true value.

Even still, Mothers Lounge tried to capture the opportunity that Amazon's third-party fulfillment platform presented. Mothers Lounge created additional subsidiaries to sell products on Amazon so that these companies would not be associated with the free, just pay shipping subsidiaries. But even with these subsidiaries, it became clear Mothers Lounge was not in compliance with Amazon pricing policies. Amazon prohibited sellers from pricing a product on a different website for an amount lower than the price listed on Amazon's website. Petitioner believed that Mothers Lounge was not in compliance with this policy because it gave away the products for free on the subsidiary websites. As with Destination Maternity, petitioner feared it was only a matter of time before Amazon removed Mothers Lounge's products from its website. Mothers Lounge operated in this limbo for six months before pulling products from Amazon because of limited sales.

Mothers Lounge may have struggled to adopt Amazon, but other companies easily and quickly shifted to the platform. This had ripple effects on Mothers Lounge's marketing campaigns that relied on reciprocal agreements in which another company would add a Mothers Lounge coupon to its packaging before sending a product to a customer. Companies began shifting to Amazon's third-party fulfillment platform, which meant that Amazon, and not the company, packaged the product. Amazon did not include advertisements in its packages.

B.     *Litigation*

Mothers Lounge also faced two lawsuits as of the valuation date. The first lawsuit involved a trademark infringement lawsuit filed by Rufflebutts, Inc. Given Mothers Lounge's business model, Mothers Lounge frequently found itself in trademark infringement cases. The Rufflebutts, Inc. lawsuit was no different. Rufflebutts, Inc., sued Mothers Lounge, claiming that Mothers Lounge's product Ruffle Buns infringed on Rufflebutts, Inc.'s trademark for its namesake product. Rufflebutts, Inc., filed this lawsuit on the valuation date, shortly after the launch of Ruffle Buns. The lawsuit caused petitioner little concern because Mothers Lounge had invested little money in the business and

**[*16]** the name could easily be changed. The case was ultimately dismissed on December 3, 2014.

The second lawsuit initially appeared to be a run-of-the-mill patent infringement case but quickly ballooned into an existential threat. Hooter Hiders, LLC, the punching bag company for Udder Covers, LLC, created a separate California company called Bebe Au Lait, LLC (Bebe Au Lait), to manage the wholesale portion of its market. Contrary to petitioner's assessment in 2005, Hooter Hiders, LLC, received a new patent for its nursing cover in 2012. Less than one year later, Bebe Au Lait filed a civil lawsuit against Mothers Lounge for patent infringement.

Initially, Mothers Lounge gave little attention to the lawsuit; however, Bebe Au Lait added a claim for illegal marketing practices under California law, related to the free, just pay shipping model. Bebe Au Lait alleged that Mothers Lounge engaged in false advertising and violated a California law that prohibits selling a product for less than the manufacturing cost. This theory threatened not only Udder Covers, LLC, but also the other subsidiaries that employed an identical business model.

Petitioner saw this lawsuit as a vengeful attempt to correct petitioner's alleged betrayal of the owners of Hooter Hiders, LLC, that would stop at nothing to end Mothers Lounge. The uncertainties surrounding this lawsuit worried petitioner. Would an unfavorable decision only restrict Mothers Lounge's sales in California? Or would Mothers Lounge need to restrict website access and advertisements to California residents? In the case of the latter, Mothers Lounge did not believe that it could exempt California from its current hard copy advertising contracts, nor could it restrict online advertisements. Moreover, if the California court sided with Bebe Au Lait, would other states follow suit and prohibit Mothers Lounge from using the free, just pay shipping model? These unknown existential threats seriously concerned petitioner. The litigation continued after the valuation date with a mixed bag of success for each side. Mothers Lounge filed a motion to dismiss, which the court granted in part and denied in part. Eventually, on April 30, 2015, the parties settled the lawsuit, and the case was dismissed.

**[*17]** C.  *The Affair and Blackmail*

On the surface, petitioner enjoyed a happy family life; however, digging a little deeper revealed issues at home that would soon significantly affect the business.  Petitioner engaged in an extramarital affair with a Mothers Lounge colleague, which began before 2012.  Unbeknownst to petitioner, someone added software to petitioner's computer that tracked his keystrokes, and this keystroke data revealed petitioner's affair to the tracker.

In 2013, the tracker sent petitioner a box with a demand letter: Deliver $100,000 by the following week or the tracker would provide all the evidence of the affair to Ms. Bosco.  Immediately after receiving the demand letter, petitioner called Ms. Bosco to tell her of his infidelity.  He then called the Federal Bureau of Investigation (FBI) to report the blackmail.  The fallout from this revelation hit at petitioner's home and at Mothers Lounge.

The news of petitioner's infidelity devastated Ms. Bosco.  For some time she sought refuge in the family home processing the news.  Ms. Bosco no longer trusted petitioner, and the marital tension spilled over into the business.  She forbade petitioner from attending tradeshows.  Petitioner sent employees in his stead, but they were not effective at identifying products to knock off or developing relationships with marketing partners.  The pair began second guessing each other's business decisions and butting into departments traditionally managed by the other.

Employees' suspicions of petitioner's infidelity were confirmed when the FBI arrived one day with the news that the tracker was a former Mothers Lounge employee.  As the subjects of a federal investigation and with their perceptions of petitioner as a family man destroyed, employee morale was at an all-time low.  Word of the infidelity also spread to customers.  Feeling the pressure, petitioner stepped down as chief executive officer to focus on his family.  Mothers Lounge posted the news of petitioner's resignation on the company's Facebook pages, and several customers commented on petitioner's affair.

VII.  *Transfers and Audits*

On the heels of the infidelity scandal and uncertainty regarding the future of their marriage, petitioner and Ms. Bosco undertook estate planning.  This included succession planning for Mothers Lounge.  As

[*18] the first step in this succession planning, petitioner and Ms. Bosco executed the First Amended and Restated Operating Agreement of Mothers Lounge, LLC (First Amended Operating Agreement), on June 1, 2014. This amendment named petitioner the manager of Mothers Lounge with the authority to manage day-to-day operations and approve distributions to members. The members could remove the manager with or without cause. The membership interests in Mothers Lounge were transferrable only by unanimous consent of the members.

On June 4, 2014, petitioner and Ms. Bosco executed an Asset and Membership Interest Purchase Agreement and Grant Acknowledgement to effect four estate planning transactions. Petitioner gave a 29.4% interest in Mothers Lounge to the Kaleb Jeremiah Pierce Irrevocable Trust and sold a 20.6% interest in Mothers Lounge to Giving Stream, LLC (Giving Stream), in exchange for a $3,419,600 note. Ms. Bosco gave a 29.4% interest to the Jeanette Court Pierce Irrevocable Trust and sold a 20.6% interest to Giving Stream in exchange for a $3,419,600 note. Giving Stream fully satisfied both notes. Giving Stream is a limited liability company that is owned 50% by the Kaleb Jeremiah Pierce Irrevocable Trust and 50% by the Jeanette Court Pierce Irrevocable Trust.

As part of this transaction, Giving Stream ratified the articles of incorporation of Mothers Lounge through the Second Amended and Restated Operating Agreement of Mothers Lounge, LLC (Second Amended Operating Agreement). The Second Amended Operating Agreement named Giving Stream as the sole member of Mothers Lounge with broad authority to manage the day-to-day operations and approve distributions. The membership interests in Mothers Lounge were freely transferable.

Petitioner and Ms. Bosco timely filed Forms 709, United States Gift (and Generation-Skipping Transfer) Tax Return, reporting the gifts described above. Both spouses reported that the 29.4% interests were valued at $4,880,400.[1] Petitioner and Ms. Bosco did not report the sales of the 20.6% interests, because they claimed the notes were equal to the values of the interests. Both spouses elected gift splitting.[2] The

---

[1] On Forms 709 both petitioner and Ms. Bosco reported a combined gift amount of $10,708,000 for an unspecified interest in Mothers Lounge and two pieces of property.

[2] Section 2513(a) provides: "A gift made by one spouse to any person other than his spouse shall, for the purposes of this chapter, be considered as made one-half by

[*19] reported valuations were based on a valuation report from David Posey, dated September 23, 2014.

On March 30, 2016, respondent selected petitioner's and Ms. Bosco's gift tax returns for audit. Ten months into the audit, petitioner and Ms. Bosco hired law firm Holland & Hart to represent them. However, before Holland & Hart could contact the IRS examiner, respondent issued a 30-day letter containing respondent's determinations of the proposed adjustments to tax. Holland & Hart requested an extension of the 30-day period to file a new valuation report, but this request was denied. Petitioner and Ms. Bosco filed a protest with the IRS Office of Appeals. The protest did not include a settlement offer, nor did it discuss the hazards of litigation. Instead, the protest indicated that petitioner and Ms. Bosco abandoned Mr. Posey's valuations and that a new valuation report from Stout Risius Ross, Inc., was pending. This new valuation report would be based on forecasted revenue estimates calculated by Jeffrey Pickett, from Lone Peak Valuation Group (Lone Peak), a business valuation, litigation consulting, and forensic accounting firm.

With the administrative appeal all but stalled waiting for the submission of the valuation report, Mr. Pickett was in a time crunch to get the forecasts to the valuation firm. Mr. Pickett primarily focused on historic financial data before and after the valuation date and Mr. Posey's report as the basis for his forecasts. Mr. Pickett described this approach as less in depth than his normal valuation engagement because of the limited scope of the engagement. He spoke with Benjamin Pierce, who identified the cause of the decline as failing marketing programs. Mr. Pickett then dug into the financial data and determined that there was in fact a decline in sales. Mr. Pickett did not recall asking Benjamin or petitioner for the universe of problems faced by Mothers Lounge but was satisfied that the post-valuation date data supported his forecasts. Mr. Pickett drafted the 2017 Lone Peak report,

---

him and one-half by his spouse," as long as both spouses have properly signified their consents to that treatment. Here both petitioner and Ms. Bosco properly elected to treat each gift as a split gift under section 2513. That is, petitioner is deemed to have transferred 50% of the gift made by Ms. Bosco and vice versa. This results in petitioner's having made four transactions with respect to his interests and Ms. Bosco's interests.

Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (Code), in effect at all relevant times, regulation references are to the Code of Federal Regulations, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure.

[*20] which set forth lower forecasted profits for Mothers Lounge than Mr. Posey's report. Holland & Hart provided the 2017 Lone Peak report to the valuation firm for use in the new valuation report. Nearly two months after petitioner and Ms. Bosco filed the protest, they submitted the new valuation report. The IRS Office of Appeals released jurisdiction back to the IRS Examination Division for consideration of the new valuation report. Petitioner and Ms. Bosco were unsuccessful again at resolving the issues with the IRS Examination Division or during a subsequent administrative appeal.

On September 19, 2018, respondent issued notices of deficiency to petitioner and Ms. Bosco related to tax year 2014. Respondent determined gift tax deficiencies for both petitioner and Ms. Bosco of $4,824,160 and accuracy-related penalties of $1,929,664.[3] Petitioner and Ms. Bosco timely filed a petition in this Court, challenging the deficiency. On December 28, 2023, we consolidated petitioner's and Ms. Bosco's cases. On the eve of trial, Ms. Bosco settled her case, and we severed the cases.

OPINION

I. *Burden of Proof*

The Commissioner's determinations in a notice of deficiency are presumed correct, and a taxpayer bears the burden of overcoming the presumption of correctness. *See Welch v. Helvering*, 290 U.S. 111, 115 (1933); *see also* Rule 142(a)(1). Here, respondent's position on brief is that the correct fair market values of the interests are less than the amounts determined in the notice of deficiency. We deem this a partial concession by respondent. *See Estate of Hinz v. Commissioner*, T.C. Memo. 2000-6, slip op. at 22. In any event, we reach our decision on the basis of the preponderance of the evidence. *See Knudsen v. Commissioner*, 131 T.C. 185, 189 (2008), *supplementing* T.C. Memo. 2007-340.

Petitioner contends that the fair market values are not only less than the values asserted by respondent but also lower than the fair market values reported on his gift tax return. It is well established that the value of an asset on a tax return is an admission against interest by the taxpayer when it conflicts with his subsequent valuation position. *McShain v. Commissioner*, 71 T.C. 998, 1010 (1979). However, this

---

[3] Respondent conceded the accuracy-related penalties.

**[\*21]** admission is not conclusive, and the trier of fact may determine what weight if any is given to this admission. *Id.* The lower values petitioner now claims must be accompanied by cogent proof that the earlier reported values were erroneous. *See Estate of Hall v. Commissioner*, 92 T.C. 312, 337–38 (1989); *Estate of Adell v. Commissioner*, T.C. Memo. 2014-155, at \*45.

II.    *Evidentiary Issue*

Before diving into the merits of the case, we address petitioner's Motion for Reconsideration of Order, filed March 31, 2024. On March 7, 2024, respondent filed a Motion in Limine to admit into evidence the 2017 Lone Peak report. Respondent's litigation valuation expert, Mark Mitchell, relies extensively on this report. Petitioner objected to the admission of the 2017 Lone Peak report, contending that it is a statement made during compromise negotiations with the IRS Office of Appeals protected under Rule 408 of the Federal Rules of Evidence (Fed. R. Evid.). Petitioner's objection extended to Mr. Mitchell's expert report in so far as it relied on the 2017 Lone Peak report.

On March 29, 2024, we granted respondent's motion in part and determined that the 2017 Lone Peak report was not barred by Fed. R. Evid. 408 in accordance with *Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co.*, 561 F.2d 1365 (10th Cir. 1997). On March 31, 2024, petitioner filed a Motion for Reconsideration of Order. Therein, petitioner requests reconsideration of our order, arguing that *Big O Tire Dealers, Inc.*, 561 F.2d at 1373 (holding that protected settlement negotiations do not commence until compromise negotiations have "crystallized to the point of threatened litigation"), was distinguishable.

This Court applies the Fed. R. Evid. when deciding evidentiary issues. § 7453. Fed. R. Evid. 408 provides that "a statement made during compromise negotiations" is not admissible "either to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction." The determination as to when compromise negotiations begin is a fact-intensive inquiry. *EEOC v. Gear Petroleum, Inc.*, 948 F.2d 1542, 1545 (10th Cir. 1991) (rejecting a brightline rule based on whether communication was made during the investigation phase or the conciliation phase of an Equal Employment Opportunity Commission investigation); *Big O Tire Dealers, Inc.*, 561 F.2d at 1372–73.

**[\*22]** Rule 161 authorizes a party to file a motion for reconsideration of an opinion or findings of fact within 30 days after a written opinion has been served, unless otherwise ordered by the Court. Although Rule 161 is in Title XVI, which addresses post-trial proceedings, a party may file such a motion regarding interlocutory orders. *See Bedrosian v. Commissioner*, 144 T.C. 152, 156 (2015). The decision to grant a motion under Rule 161 lies within the Court's discretion. *See Bedrosian*, 144 T.C. at 156. A motion for reconsideration is generally denied in the absence of substantial error or unusual circumstances. *See Estate of Quick v. Commissioner*, 110 T.C. 440, 441 (1998), *supplementing* 110 T.C. 172 (1998).

Here, we see no reason to grant petitioner's motion for reconsideration. As discussed extensively below, we place no weight on the 2017 Lone Peak report or Mr. Mitchell's report to the extent it relies on that report. Therefore, petitioner's motion has no impact on the current proceeding. We will deny petitioner's Motion for Reconsideration of Order, filed March 31, 2024.

III. *Expert Witnesses*

Both parties relied on expert opinions to value the Mothers Lounge interests. We evaluate an expert's opinion in the light of his or her qualifications and all the evidence in the record. *See Helvering v. Nat'l Grocery Co.*, 304 U.S. 282, 295 (1938); *Estate of Mellinger v. Commissioner*, 112 T.C. 26, 39 (1999). "The persuasiveness of an expert's opinion depends largely upon the disclosed facts on which it is based." *Estate of Davis v. Commissioner*, 110 T.C. 530, 538 (1998). We are not bound to follow any expert witness's opinion where it is contrary to our own judgment. *Helvering v. Nat'l Grocery Co.*, 304 U.S. at 295; *Estate of Hall*, 92 T.C. at 338. We may adopt or reject an expert's opinion in whole or in part. *Estate of Davis*, 110 T.C. at 538.

A. *Jeffrey Pickett*

Petitioner offered the expert testimony of Jeffrey Pickett, a managing director of Lone Peak. Mr. Pickett's expertise includes the valuation of business interests and intangible assets. His expert report (2024 Lone Peak report) was received at trial as his direct testimony under Rule 143(g)(2) and provides his valuation of the interests. Mr. Pickett also prepared the 2017 Lone Peak report discussed above.

In the 2024 Lone Peak report, Mr. Pickett opined that the fair market value of Mothers Lounge as of the valuation date was

[*23] $18,678,000 before accounting for marketability and control discounts. Mr. Pickett applied a 25% marketability discount and a 5% control discount. After considering these discounts, he valued the 29.4% gift interest at $3,913,000 and the 20.6% sale interest at $2,741,000.

Respondent offers a rebuttal report by Mark Mitchell of Mitchell Fox Valuation Advisors, LLC (Mitchell Fox), an independent business valuation firm, to rebut Mr. Pickett's opinion. Mr. Mitchell is a principal of Mitchell Fox whose expertise includes business valuations for tax requirements. His rebuttal report was received at trial as his rebuttal testimony under Rule 143(g)(2). His rebuttal report critiqued Mr. Pickett's forecasts, the use of a company specific risk adjustment in the cost of capital, and the excess cash calculation.

B.    *Josh Cashman*

Petitioner also offered the expert testimony of Josh Cashman, a financial analyst who specializes in valuations of e-commerce companies. While working as a financial analyst in 2014, Mr. Cashman founded an e-commerce business that primarily focused on sales via the Amazon third-party fulfillment platform. His expert report was received at trial as his direct testimony under Rule 143(g)(2) and discusses the business environment relevant to an e-commerce business in 2014. His report sets forth the relevant market trends from 2014.

C.    *Mark Mitchell*

Respondent offered the expert testimony of Mark Mitchell. His expert report (Mitchell expert report) was received at trial as his direct testimony under Rule 143(g)(2) and provides his valuation of the interests. Mr. Mitchell testified that he reviewed and relied on without independent verification the projections in the 2017 Lone Peak report.

Mr. Mitchell valued Mothers Lounge at $28,107,338 before accounting for marketability and control discounts. Mr. Mitchell applied a 30% marketability discount and a control discount on nonoperating assets. After accounting for these discounts, he calculated the value of the 29.4% gift interest at $5,784,421 and the value of the 20.6% sale interest at $4,053,029.

Petitioner offered the report of Eric Madsen of Berkley Research Group, and economic and financial analysis firm, as a rebuttal to Mr. Mitchell's report. Mr. Madsen is a managing director of Berkley Research Group whose expertise lies in financial economics and complex

**[\*24]** transactions. His expert report was received at trial as his rebuttal testimony under Rule 143(g)(2).

IV.  *Gift Valuation*

A.  *In General*

The Code imposes a tax on the transfer of property by gift during a calendar year. § 2501. The tax is based on the taxable gifts made in a calendar year. § 2502(a). The term "taxable gift" means all gifts made in the year less certain deductions not relevant here. § 2503(a). The total amount of gifts in the year is the sum of the value of gifts made in the year in excess of the exclusion amount in section 2503(b).[4] "Where property is transferred for less than an adequate and full consideration . . . then the amount by which the value of the property exceeded the value of the consideration shall be deemed a gift . . . ." § 2512(b). Conversely, property exchanged for "adequate and full consideration" does not constitute a gift for federal gift tax purposes. *See id.*

The fair market value of gift property is determined as of the date it is given. § 2512(a). The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell, and both having reasonable knowledge of relevant facts. *United States v. Cartwright*, 411 U.S. 546, 551 (1973); *Estate of Newhouse v. Commissioner*, 94 T.C. 193, 217 (1990); Treas. Reg. § 25.2512-1; *see also* Rev. Rul. 59-60, 1959-1 C.B. 237.

In general, "property is valued as of the valuation date on the basis of market conditions and facts available on that date *without regard to hindsight.*" *Estate of Gilford v. Commissioner*, 88 T.C. 38, 52 (1987). Subsequent events are not considered in fixing fair market value, except to the extent that they were reasonably foreseeable on the valuation date. *Id.* at 52–53.

The valuation is ultimately a question of fact in which we must weigh all relevant evidence and draw appropriate inferences. *See Estate of Newhouse*, 94 T.C. at 217. Here, we must determine the fair market value of a 29.4% interest and a 20.6% interest in Mothers Lounge. Because the 20.6% interest was exchanged for a note valued at

---

[4] Petitioner concedes that he was not entitled to an exclusion amount under section 2503(b).

**[\*25]** $3,419,600, the exchange is a taxable gift only to the extent the value of the interest exceeds the face value of the note.

B.  *Valuation Approaches*

In valuing stock of a closely held corporation, we first consider actual sales of the stock at arm's length in the normal course of business at or around the time of valuation.  *See Duncan Indus., Inc. v. Commissioner*, 73 T.C. 266, 276 (1979).  The record here does not show any other recent sales of interests in Mothers Lounge at arm's length. In the absence of actual sales of the company's stock, courts typically consider one or more of three approaches to determine the stock's fair market value: (1) the market approach, (2) the income approach, and (3) the asset-based approach.  *See Bank One Corp. v. Commissioner*, 120 T.C. 174, 306 (2003), *aff'd in part, vacated and remanded in part sub nom. JPMorgan Chase & Co. v. Commissioner*, 458 F.3d 564 (7th Cir. 2006).

The market approach compares the subject stock with stock in similar companies sold in arm's-length transactions in the same timeframe to establish a value. *See id.* at 307.  This approach values the subject stock by considering the sale price of the comparable stock and the differences between the comparable stock and the subject stock.  *Id.* Courts apply this approach only when the comparable stock has qualities substantially similar to those of the subject stock.  *Id.*

The income approach capitalizes income and discounts cashflow to determine the value of stock.  *Id.*  This method is premised on the assumption that the value of a company should be determined on the basis of the present value of the future distributed earnings. *See Estate of True v. Commissioner*, T.C. Memo. 2001-167, slip op. at 187, *aff'd*, 390 F.3d 1210 (10th Cir. 2004).

The asset-based approach generally values stock by determining the cost to reproduce it.  *Bank One Corp.*, 120 T.C. at 307.  For a nonpublicly traded corporation, this method values the corporation on the basis of the fair market value of its net assets.  *See, e.g.*, *Estate of Jones v. Commissioner*, T.C. Memo. 2019-101, at \*29; *Estate of Noble v. Commissioner*, T.C. Memo. 2005-2, slip op. at 17.

The parties agree that the income approach, specifically the discounted cashflow method, is the best method to determine the value of the interests.  We agree that this is the proper approach to value Mothers Lounge.  *See Estate of Adell*, T.C. Memo. 2014-155, at \*49

**[\*26]** (determining that the income approach was most appropriate to value a business when its best value was as a going concern). Neither party found a comparable company with a recent sale that could act as the basis for the market approach. *See Estate of Gallagher v. Commissioner*, T.C. Memo. 2011-148, slip op. at 22 (rejecting use of the market approach when an expert could not find sufficiently comparable companies), *supplemented by* T.C. Memo. 2011-244. Likewise, the asset-based approach is inappropriate because the value of Mothers Lounge as a going concern significantly exceeds the value of its net assets. *See Estate of Adell*, T.C. Memo. 2014-155, at \*45–49. We also note that Mothers Lounge operates with relatively few assets apart from inventory and holds few to no assets for investment.

We are thus satisfied that the income approach, and specifically the discounted cashflow method, is the proper method to value Mothers Lounge. The discounted cashflow method determines the value of the business by adding the present value of projected cashflows for a discrete period, the present value of the business's terminal value, and the nonoperating assets of the business. *See Estate of True*, T.C. Memo. 2001-167, slip op. at 187; *Estate of Maggos v. Commissioner*, T.C. Memo. 2000-129, slip op. at 30, *aff'd in part, remanded in part*, 32 F. App'x 305 (9th Cir. 2002). Thus, to determine the value of the business, we must determine (1) the projected future cashflows for a discrete period, (2) the discount rate that will be applied to these future distributions to determine the present value, (3) the terminal value of the company, and (4) the nonoperating assets. *See Estate of Jackson v. Commissioner*, T.C. Memo. 2021-48, at \*66; *Estate of True*, T.C. Memo. 2001-167, slip op. at 187; *Estate of Hendrickson v. Commissioner*, T.C. Memo. 1999-278, slip op. at 39.

The projected future cashflows are forecasted estimates of the earnings that will be available for distribution to the owners. These projected future cashflows are estimated for a discrete period of time; for example, every year for five years. *See Estate of Jung v. Commissioner*, 101 T.C. 412, 424 n.6 (1993). These projections include consideration of the expected revenue and expenses[5] of the company. *See Estate of True*, T.C. Memo. 2001-167, slip op. at 187. As a simplified example, a business may be expected to earn $100 in revenue and have $50 in expenses each year for the next five years; in other words, the

---

[5] As we will discuss later, these expenses may include entity-level tax.

**[\*27]** business can expect $50 in profit that can be distributed to shareholders.[6]

But the value of money in the future is not as valuable as money today, especially when there is risk involved in an investment. To account for the time value of money and additional compensation a shareholder would demand because of the unique risk factors of an investment, the cashflows over the discrete period are discounted by a discount rate to their present value. *See Estate of Jackson*, T.C. Memo. 2021-48, at \*66. In the earlier example where a business earns $50 in profit that is available to distribute to shareholders in each of the next five years, the value of the business would not be $250 (the sum of $50 for five years). Instead, we would need to apply a discount rate to account for the risk-free rate of return and the investment-specific rate of return. In this example, let us assume the discount rate is 10%. The value of the five $50 payments over five years is approximately $190.[7]

This accounts for the value of the business only over the discrete period. In ordinary circumstances it would be unusual to assume that a business would cease to exist after this period. This is where the terminal value comes in. The terminal value estimates the value of an indefinite income stream after the discrete period. *Id.* at \*160. This calculation captures the projected future cashflows after the discrete period which are too difficult to predict with precision. *Id.* To calculate the terminal value, a "'normalized' cash-flow figure is then capitalized as a perpetuity by the previously determined discount rate, adjusted for some level of growth that can be expected to continue into perpetuity." *BTR Dunlop Holdings, Inc. & Subs. v. Commissioner*, T.C. Memo. 1999-377, slip op. at 17.

Continuing the example above with the business earning $50 of profit each year that can be distributed to the shareholders, let us assume that the cashflow in the final year remains at $50 and the long-term growth rate is estimated at 5%. The value of the cashflow in

---

[6] While we leave the ultimate calculation of the value of the business to the parties under Rule 155, we believe this simplified example helps illustrate the importance of the variable selected for the discounted cashflow analysis.

[7] To calculate this value, the $50 of cashflows in years 1 through 5 are divided by one plus the discount rate raised to a power of the number of years until the payment is received. For example, the present value of the cashflow in year 2 is calculated by dividing $50 by 1.21 ($1.1^2$).

**[*28]** perpetuity is $1,050.[8]  This represents the terminal value of the business as of year 5.  This terminal value is discounted back to the present value as of the valuation date using the 10% discount rate above.  The present value of this terminal value is approximately $652.[9]

The final component in valuing the business is adding the value of nonoperating assets which are not accounted for elsewhere in the calculation.  *Estate of Maggos*, T.C. Memo. 2000-129, slip op. at 30; *Estate of Kaufman v. Commissioner*, T.C. Memo. 1999-119, slip op. at 17–18, *rev'd sub nom. Morrissey v. Commissioner*, 243 F.3d 1145 (9th Cir. 2001).  Nonoperating assets include excess cash on hand.  *Estate of Renier v. Commissioner*, T.C. Memo. 2000-298, slip op. at 19–21.  In our ongoing example, we will assume the business has $100 cash on hand as of the valuation date and a working capital need of $50.  This means that the business has $50 of excess cash that is classified as a nonoperating asset.

Finally, to determine the value of the business we add the present value of projected cashflows for a discrete period, the present value of the business's terminal value, and the nonoperating assets of the business.  *Estate of True*, T.C. Memo. 2001-167, slip op. at 187; *Estate of Maggos*, T.C. Memo. 2000-129, slip op. at 30.  In our ongoing example, the business would be worth $892.[10]

V.     *Value of Mothers Lounge: Court's Analysis*

We address each portion of the discounted cashflow analysis below to determine the value of Mothers Lounge as of the valuation date.

A.     *Projected Future Cashflows for a Discrete Period*

First, we must consider the appropriate projected future cashflows for a discrete period, considering the revenue and expenses of Mothers Lounge.  *See Estate of True*, T.C. Memo. 2001-167, slip op. at 187.  One expense deserves additional explanation: entity-level taxes.  Because an S corporation is not liable for an entity-level tax, free

---

[8] To calculate this value, the income stream of $50 is multiplied by the long-term growth rate plus 1.  The result is then divided by the difference between the discount rate and the long-term growth rate (10% − 5%).

[9] To calculate this value, the cashflow of $1,050 is divided by 1 plus the discount rate raised to the power of 5.

[10] This value is the sum of the present value of cashflows for the discrete period ($190) plus the terminal value ($652) plus nonoperating assets ($50).

**[\*29]** cashflow projections are typically performed without considering tax implications on a business's earnings. However, in limited circumstances, the Court may allow the earnings to be "tax affected" by applying a hypothetical entity-level tax. *See Estate of Cecil v. Commissioner*, T.C. Memo. 2023-24, at \*25; *Estate of Jones*, T.C. Memo. 2019-101, at \*39–41. Proponents of tax affecting argue that it is necessary to account for the fact that valuation data used in valuing an S corporation is based on data from C corporations, which pay an entity-level tax. *See Dallas v. Commissioner*, T.C. Memo. 2006-212, slip op. at 7 n.3. In determining the tax affecting rate, we require experts to consider both the advantages (such as a lower overall tax burden) and disadvantages (such as limitations on ownership) of an S corporation. *See Gross v. Commissioner*, T.C. Memo. 1999-254, slip op. at 27–29, *aff'd*, 272 F.3d 333 (6th Cir. 2001). If tax affecting is warranted, we will reduce the earnings of the S corporation by a hypothetical entity-level tax. *See Estate of Jones*, T.C. Memo. 2019-101, at \*39–41.

Here, Mr. Mitchell forecasts estimated cashflows between 2014 and 2018. He applies a hypothetical entity level tax of 25.8%. Mr. Pickett on the other hand forecasts estimated cashflows between 2014 and 2019. He applies a hypothetical entity level tax of 26.2%. We must determine the appropriate projected cashflows from Mothers Lounge and determine whether tax affecting is appropriate.

### 1. *Forecasted Revenue and Expenses*

In determining the future cashflows of Mothers Lounge for the discrete period after the valuation date, the Mitchell expert report and the 2024 Lone Peak report reach significantly different conclusions. Mr. Mitchell adopted the forecasts from the 2017 Lone Peak report without any independent analysis. Functionally, we are comparing two reports from Mr. Pickett: one from 2017 and another from 2024.

### a. *Mr. Mitchell's Projections*

We easily reject Mr. Mitchell's projections as knockoffs of the 2017 Lone Peak report. An expert may rely on another expert's forecasted revenue projections only if the relying expert is familiar with the methods used to derive the opinion and the expert independently corroborates the projections. *See TK–7 Corp. v. Estate of Barbouti*, 993 F.2d 722, 732 (10th Cir. 1993); *see also Mooring Cap. Fund, LLC v. Knight*, 388 F. App'x 814, 820–21 (10th Cir. 2010) (rejecting the reliance on a preexisting appraisal when the expert did not examine the validity

[*30] of the underlying assumptions). The party that relies on the preexisting expert report bears the burden of proving the underlying assumptions in that report. *See TK–7 Corp.*, 993 F.2d at 732.

Mr. Mitchell failed to show that he made this independent corroboration. His report does not indicate that he reviewed the underlying data or grappled with the assumptions underlying the report. Instead, he merely added a block quote from the 2017 Lone Peak report which listed the sources of information used in the projections and the results of a reasonableness check. He then indicated that he "consider[ed] the projections from the [2017] Lone Peak report to represent a reasonable basis on which to base assumptions for the income approach analysis" without further analysis.

At trial Mr. Mitchell testified generally that he reviewed and agreed with the conclusions in the 2017 Lone Peak report. However, when pressed on the issue he stated that he did not independently verify any of the data in the report nor did he conduct any tests to determine the reliability of the 2017 Lone Peak report.

There are several concerns readily apparent as to the soundness of the assumptions made in the 2017 Lone Peak report that Mr. Mitchell did not address. For example, the 2017 Lone Peak report does not discuss—much less analyze—the impact of petitioner's infidelity and the corresponding FBI investigation that was known as of the valuation date. This caused extreme dysfunction with the company's management and demoralized the workforce. Specifically, Ms. Bosco forbade petitioner from attending tradeshows, which cut off the primary source of new product ideas and placed at further risk the Destination Maternity contract. The infidelity is just one of the neglected issues underlying the 2017 Lone Peak report.

The 2017 Lone Peak report also relied extensively on post-valuation data. In fact, Mr. Pickett testified that he "couldn't reach that same conclusion, empirically, without the additional post-valuation data information." This reliance blurs the line between information that was known or knowable as of the valuation date and the information that was not reasonably foreseeable as of the valuation date. *See Estate of Gilford*, 88 T.C. at 52. Although Mr. Pickett prepared the projections in the 2017 Lone Peak report closer in time to the valuation date than the 2024 Lone Peak report, his projections in 2017 do not accurately capture the known and knowable business challenges facing Mothers Lounge at that time. Therefore, we accord Mr. Mitchell's forecasts no weight.

[*31]     b.     *Mr. Pickett's Projections in the 2024 Lone Peak Report*

Mr. Pickett's projections in the 2024 Lone Peak report offer the clearest forecast of Mothers Lounge's business as of the valuation date. His projections are based on industry data from the online baby product industry (and the corresponding data from the IBISWorld Industry Report). Mr. Pickett selected the online baby product industry as comparable because he determined that most of the products sold by Mothers Lounge were included within the industry.

Mr. Pickett projected that Mothers Lounge's sales would continue to grow at its current rate through 2014 by annualizing sales to date. After 2014, Mr. Pickett forecasted that sales would decline to the growth rate of the online baby product industry through 2017 before gradually declining to the long-term growth rate of 3%. As for expenses, Mr. Pickett projected that Mothers Lounge's earnings before interest, tax, depreciation, and amortization (EBITDA or profit margin) as a percentage of sales would decline from 28.94% in 2013 to the online baby product sale industry average of 7.4% by 2017. Mr. Pickett based these declines to industry average on increasing competition in the industry, the inability to pivot the business model to embrace technology, the limitations of the free, just pay shipping model, the lack of new product development, and the increasing expenses related to litigation and the affiliated marketing program.

Respondent raised several critiques of Mr. Pickett's forecasts that we will address in turn: (1) Mr. Pickett selected the incorrect industry to base his projections on, (2) Mr. Pickett considered later occurring events not known or knowable as of the valuation date, and (3) it is unreasonable to assume that Mothers Lounge would decline to industry profit margins.

First, respondent argues that the online baby product industry comprises a product mix completely different from Mothers Lounge's and therefore cannot serve as a basis for Mothers Lounge's forecast. Respondent does not offer an alternative industry for forecasting purposes. Mr. Pickett's reliance on data from the online baby product industry was reasonable. According to IBISWorld, the online baby product industry is defined as retailers that sell baby and toddler products online. These products include diapers, clothing, nursing supplies, toys, strollers, and furniture. Mothers Lounge's product mix fell almost exclusively within the industry.

[*32] Additionally, this industry is appropriate because it narrows the baby product industry to online sales, which capture unique customer characteristics and related business activities. In the age of two-day Amazon delivery, it may be hard to remember the long shipping times common for e-commerce businesses in the early 2010s. This extended lead time made e-commerce customers distinguishable from their counterparts who shopped at brick-and-mortar stores. Brick-and-mortar store customers could wait until a need was pressing before purchasing a product. In contrast, online shopping customers had to anticipate future needs. This model removed urgencies in purchasing and often led to online shoppers' searching for the best deal. It was also significantly easier to comparison shop online than in person because a customer did not have to travel to another store to compare products and prices. Considering the overlap of products and tailoring to online customers, we are persuaded that the online baby product industry is the best industry to track the sales growth and EBITDA of Mothers Lounge.

Next, we consider whether the events Mr. Pickett considered in his forecasts were known or knowable as of the valuation date. As noted above, we may consider post-transaction events in valuing a business only to the extent they were reasonably known or knowable by the date of valuation. *Estate of Gilford*, 88 T.C. at 52. The events Mr. Pickett relies upon to make his determination were known or knowable as of the valuation date.

Mr. Pickett's forecast focuses on the increased competition in the industry. The industry and particularly Mothers Lounge had high profit margins coupled with exceptionally low barriers to entry. Mr. Pickett states that this combination would encourage new companies to enter the market and reduce Mothers Lounge's profits. Respondent pushes back on Mr. Pickett's theory, arguing that other businesses had no way to know about Mothers Lounge's excessive profit margins. While Mothers Lounge did not publicly disclose its earnings reports, the history of the business shows just how easy it is to deduce the high margins. Mothers Lounge's business model consisted of finding a mother or baby product that had a relatively high price but appeared simple to manufacture, sending a copy of it to a low-cost manufacturer to replicate, and mass producing the product to take advantage of the high margins. Mothers Lounge did this time and time again. A new business entering the market and seeing the success of Mothers Lounge could use this strategy against Mothers Lounge.

[*33] Several other known and knowable trends informed Mr. Pickett's forecasts. First, in addition to new businesses entering the market, big retailers aggressively pursued growth in the online baby product market and quickly increased their market shares in the year before the valuation date. As Mr. Cashman explained in his expert report, Amazon's dominance in the e-commerce space was well known as of the valuation date. Likewise, Target and Walmart aggressively expanded their baby e-commerce business in 2013 and 2014. Like Mothers Lounge, the big retailers attempted to capture the most price sensitive customers. Unlike Mothers Lounge, these retailers had name recognition and trust to draw prospective customers. They also offered transparency, free shipping, and return policies. Any intrusion into the market by these big retailers would be focused on Mothers Lounge's market share.

By the valuation date the limitations of the free, just pay shipping business model were clear, and Mothers Lounge was locked into this business model. Between 2009 and the valuation date, 97% of Mothers Lounge's revenue was from customers that received a "free product" and paid the inflated shipping cost. Over 96% of total orders used a discount code. Mothers Lounge sold products of an inferior quality compared to the name brand products, and it did not offer any services related to its products that created value, such as robust customer service. It could not compete with the name brand products at the inflated price point it listed on the subsidiaries' websites.

At the same time, Mothers Lounge could not reduce the price of its products. Mothers Lounge could not list products for sale on websites such as Amazon because it would undermine the sales from the subsidiary websites. That is, if a customer saw a product selling for a few dollars on Amazon and then saw the same product selling on a Mothers Lounge website for a list price of $35, she would not think the free, just pay shipping option was a good deal. As Mr. Cashman explained in his expert report, the Amazon third-party fulfillment market had tremendous growth in 2013 with future growth expected.

Respondent argues that Mothers Lounge could have abandoned its business model and sold products in the traditional manner for a reasonable cost. This argument ignores that Mothers Lounge failed when it attempted to adopt a more traditional business model with subsidiary Hotslings, LLC, after the acquisition in 2011. Even if Mothers Lounge reduced its products' prices and switched to a traditional business model, low-cost retailers could beat Mothers

[*34] Lounge on quality and price because of economies of scale. Mothers Lounge was effectively locked into the free, just pay shipping model.

Respondent also argues that Mothers Lounge could simply increase prices. However, the free, just pay shipping model had an overall cap as to the amount a customer would pay for shipping. If the shipping price got too high, a customer would not believe that she was getting a good deal. Additionally, Mothers Lounge could not increase sales by cross-listing products between subsidiaries because the customer had to pay the shipping cost for each product for Mothers Lounge to continue to profit. That is, if a customer received two products for "free" but paid only one shipping price, it would cut into Mothers Lounge's profits.

Mr. Pickett also based his forecasts on the lack of new products in development, a fact certainly known as of the valuation date. Mothers Lounge's prior growth was primarily attributable to introducing new products that caused explosive growth in the early years and slowed over the life of the product. For example, Seven Slings, LLC, fueled explosive growth in 2011 with a 146% increase in revenue compared to the prior year. This growth quickly slowed to 33% in 2012 and 11% in 2013. A similar trend is present with Udder Covers, LLC, with 94% growth between 2009 and 2010 that declined to a growth rate of 44% in 2013. On the other hand, new products created explosive growth. For example, 2012 was the first full year in which Carseat Canopy, LLC, was operational. In that year Carseat Canopy, LLC, represented 43% of Mothers Lounge's revenue, earning more revenue than Mothers Lounge as a whole in 2011. Without a new product in development, Mothers Lounge would not be able to sustain its significantly above-average growth. As of 2014, there was no indication that Mothers Lounge would find a new product. Petitioner testified that he thought Mothers Lounge had found all the products that met the business model formula and that the fallout from his infidelity would limit opportunity to find new products. All signs indicated that the lack of new product development would continue.

Mr. Pickett noted a variety of other factors known as of the valuation date that signaled a decline in Mothers Lounge's growth rate and profits. First, before the valuation date Mothers Lounge increased the compensation it paid affiliates without a corresponding increase in sales. Updated email spam filters also severely limited Mothers Lounge's email marketing as filters flagged emails with the word "free"

[*35] as spam. Given that Mothers Lounge's emails offered customers a coupon for a "free" product, there was limited ability to get around this spam filter. This restricted the effectiveness of Mothers Lounge's marketing campaigns and correspondingly would decrease its sales.

Finally, Mothers Lounge's hesitancy to embrace social media signaled an impending decline in its business. Mothers Lounge sought to decrease, not increase, customer interactions and reviews largely because of its deceptive business model and poor-quality products. Even in the early days of blogs sponsored by mother and baby retailers, Mothers Lounge received harsh criticism. This created an environment where management suppressed opportunities for customer feedback, namely social media. The few social media advertising campaigns Mothers Lounge tried had failed as customers began disclosing their poor experiences with Mothers Lounge. In contrast, competitors took advantage of the low-cost advertising to get their products in front of more consumers and drive sales. Failing to adopt this marketing trend placed Mothers Lounge at a disadvantage.

But Mr. Pickett's forecasts were not all doom-and-gloom. He noted that year-to-date sales for 2014 indicated growth. He also noted that Mothers Lounge had a strong history of growth, which is correlated with future growth. On the basis of these factors, Mr. Pickett continued to forecast growth though at a slowing rate given the reasons stated above. Mr. Pickett's forecast accurately accounted for known and knowable market trends around the valuation date. He did not rely on post-valuation date information to predict the downfall of Mothers Lounge. Instead, he identified the strengths and weaknesses of Mothers Lounge in the rapidly evolving market.

As a last attempt to discredit Mr. Pickett's forecast, respondent argues that it was unreasonable to predict that Mothers Lounge would decline to the average profit margin in the online baby product industry. The online baby product industry comprises several large retailers that operate with profits much lower than the industry average, such as Amazon and Target. Respondent reasons that if these big retailers are operating at below-industry profit margins, the remaining smaller companies must have higher margins. Thus, he argues that Mothers Lounge fits into this latter category and has higher-than-average profit margins.

We reject this argument considering Mothers Lounge's business model. Mothers Lounge focused its entire business strategy on targeting

[*36] the most price sensitive consumer and offering her a "free" product. This business model is much closer to that of the big retailers than the small boutique portion of the industry and would suggest profit margins lower than average. However, because this is difficult to quantify, we accept Mr. Pickett's assessment that Mothers Lounge's profit margins would decline to industry standards. Overall, we find that Mr. Pickett's forecasts in the 2024 Lone Peak report are credible, and we adopt them to value Mothers Lounge.

### 2. *Tax Affecting Rate*

As noted above, an additional consideration that affects the forecasts is tax affecting. There is little difference between the tax-affecting rates of the experts. However, we must determine whether the record is sufficient to apply tax affecting because of our limited approach to the application of tax affecting.

Where, as here, the data used to value an S corporation is largely based on the data from C corporations, proponents of tax affecting believe that the mismatch from pretax cashflows and after-tax discount rates must be adjusted through tax affecting to ascertain the fair market value of an S corporation. *See Dallas*, T.C. Memo. 2006-212, slip op. at 7 n.3 ("[I]n the context of valuation of stock of an S corporation, 'tax affecting' is the discounting of estimated future corporate earnings on the basis of assumed future tax burdens imposed on those earnings, such as from the loss of S corporation status and imposition of corporate-level tax."). To achieve this, appraisers include a fictitious tax burden that is applied to reduce earnings before they are discounted to the present. *See Estate of Cecil*, T.C. Memo. 2023-24, at *25.

Tax affecting has been narrowly applied by this Court. Where a party fails to adequately explain the necessity of tax affecting or the experts disagree as to whether it is necessary, we have rejected the application of tax affecting. *See Estate of Gallagher*, T.C. Memo. 2011-148, slip op. at 32 (finding that tax affecting was not appropriate where an appraiser failed to explain his reasoning for tax affecting); *Dallas*, T.C. Memo. 2006-212, slip op. at 16–21 (finding tax affecting not appropriate when the taxpayer presumed that an S corporation would lose its S corporation status after a sale). We have also rejected it where the experts have not accounted for the benefits of S corporation status to shareholders, namely a reduction in the total tax burden imposed on a business. *See Gross*, T.C. Memo. 1999-254, slip op. at 27–29.

**[\*37]** However, we have applied it where the record clearly sets out the necessity for tax affecting. *See, e.g.*, *Estate of Jones*, T.C. Memo. 2019-101, at \*41; *Estate of Cecil*, T.C. Memo. 2023-24, at \*27. In *Estate of Jones*, T.C. Memo. 2019-101, at \*39, the parties agreed that a hypothetical buyer and seller would consider a business's entity form when valuing a limited partnership interest. The parties merely disputed how to account for this factor. *Id.*

One method to apply tax affecting to an S corporation's earnings is through the Delaware Chancery method. This method of tax affecting applies a reduced fictitious tax rate at the entity level to account for the lower overall tax burden of a passthrough entity. *See Del. Open MRI Radiology Assocs., P.A. v. Kessler*, 898 A.2d 290, 330 (Del. Ch. 2006). This fictitious tax rate is based on the ratio of overall passthrough entity taxes (individual tax rates) compared to the overall C corporation tax rate (corporation tax rates and shareholder-level tax rates). *Id.* This method accounts for the burdens of current tax that the owner might owe on the entity's earnings and the benefits of future dividend tax avoided. *Id.* This ratio is applied to the C corporation tax rate to estimate the fictitious entity-level tax rate. There is a complex process to devise this fictitious entity-level tax rate. However, for our purposes this high-level overview is sufficient.

Mr. Pickett and Mr. Mitchell agree that a hypothetical buyer and seller would consider the fact that Mothers Lounge is an S corporation. They also agree that the proper method to account for this variable is the Delaware Chancery method. Mr. Pickett and Mr. Mitchell merely disagree as to the proper rate. Under these circumstances, it is proper to apply tax affecting to Mothers Lounge's earnings. We emphasize that while we apply tax affecting here, given the unique setting at hand, we are not necessarily holding that tax affecting is always, or even often, a proper consideration for valuing an S corporation.

Mr. Pickett calculated the fictitious tax rate at 26.2% and Mr. Mitchell calculated it at 25.8%. This disparity stems primarily from the difference in individual income tax rate applied.[11] Mr. Pickett calculated the individual income tax rate at 41.54%, which factored in the graduated federal income tax rate and flat Utah state tax rate. Mr. Mitchell calculated this rate at 46.4% without explanation. Mr.

---

[11] In calculating cashflow after the corporate level tax, Mr. Pickett also added back noncash expenditures such as depreciation to calculate the amount of cash distributable to the shareholder. Mr. Mitchell does not contest that this is correct.

**[\*38]** Mitchell's calculation of the individual tax rate lacks necessary supporting calculations to verify the accuracy of his tax affecting rate. *See* Fed. R. Evid. 702 (requiring expert testimony be helpful to the trier of fact, based on sufficient data, and the product of reliable principles and methods); *Wycoff v. Commissioner*, T.C. Memo. 2017-203, at \*42–43 (rejecting expert witness findings because of the expert's failure to disclose underlying data). In contrast, we are satisfied that Mr. Pickett reasonably calculated the individual tax rate by applying the graduated tax rates to Mothers Lounge's income. Therefore, we accept Mr. Pickett's fictitious entity-level tax rate of 26.2%.

      B.    *Discount Rate*

The discount rate accounts for the time value of money in computing the present value of future cashflows. *Estate of Jackson*, T.C. Memo. 2021-48, at \*66. The parties agree that this discount rate should be derived through the weighted average cost of capital formula. *See id.* at \*67–68. We have previously held that the weighted average cost of capital formula is an improper analytical tool to value a "small, closely held corporation with little possibility of going public." *Estate of Hendrickson*, T.C. Memo. 1999-278, slip op. at 43 (quoting *Furman v. Commissioner*, T.C. Memo. 1998-157, slip op. at 28). Neither party anticipated that Mothers Lounge will become a publicly held company; however, because both experts used weighted average cost of capital as the rate of return in their analyses, and neither party otherwise raised the issue, we shall adopt it, although we do not set a general rule in doing so. The weighted average cost of capital formula is based on both the cost of equity, that is, the required return for an investor in stock, and the cost of debt. *See Estate of Jackson*, T.C. Memo. 2021-48, at \*67–68. Both experts ignored the cost of debt in the equation because Mothers Lounge had no debt.

There are many formulas to calculate the cost of equity, but for our purposes we focus on the "build-up method" upon which both Mr. Mitchell and Mr. Pickett rely. *See, e.g., id.* at \*67–68 (describing the capital-asset pricing model). The build-up method bases the cost of equity on the interest rate paid on governmental obligations and increases it to compensate the investor for disadvantages of the proposed investment. *See Estate of Gallagher*, T.C. Memo. 2011-148, slip op. at 36 n.15 (citing *Estate of Klauss v. Commissioner*, T.C. Memo. 2000-191, slip op. at 12 n.11). The risks above the government obligation rate can include the general risk of the stock market (market premium), risk associated with the size of the company (size premium),

[*39] and the unique risk associated with a company (company-specific premium).  *See Estate of Jackson*, T.C. Memo. 2021-48, at \*117; *Estate of Adams v. Commissioner*, T.C. Memo. 2002-80, slip op. at 11–13.

Mr. Pickett and Mr. Mitchell reach nearly identical costs of equity before considering company-specific risk: Mr. Pickett estimates it at 17% and Mr. Mitchell estimates it at 18%.  Mr. Pickett based his cost of equity analysis on industry data provided by the Kroll cost of capital navigator for the nonstore retailers industry.  He did not provide the underlying data.  To support his calculations, he provided a couple of spreadsheets that cite the Kroll cost of capital navigator.  On the other hand, Mr. Mitchell based his cost of capital on the average result of three equations.  He consulted the *2014 Valuation Handbook, Guide to Cost of Capital, Market Results Through 2013* from Duff & Phelps for two industries: SIC code 56 apparel and accessory stores and SIC code 562 women's clothing stores.  Moreover, Mr. Mitchell provided a thorough review of his process and the academic papers that supported his equations.  Even though the industries Mr. Mitchell selected may not capture all of Mothers Lounge's products, we find his data set and analysis for his estimate of 18% cost of equity more persuasive than Mr. Pickett's data set and analysis.

The experts' true source of conflict comes from the company-specific risk factor.  As noted above, the build-up method allows for the consideration of company-specific risks that are not present in the larger market.  *See Estate of Jackson*, T.C. Memo. 2021-48, at \*117–18; *BTR Dunlop Holdings, Inc. & Subs.*, T.C. Memo. 1999-377, slip op. at 22–23.  We have previously accepted company specific risk adjustments where a company had the possibility of an unsustainable business model. *Estate of Adams*, T.C. Memo. 2002-80, slip op. at 12.  A company-specific risk premium must not include factors already accounted for in determining the cost of equity.  *See Rakow v. Commissioner*, T.C. Memo. 1999-177, slip op. at 17 (rejecting adding a company-specific risk premium to account for risks covered by the size risk premium including a smaller geographic area, lack of management depth, and less access to capital markets).

Mr. Pickett added a 5% company-specific risk adjustment to his cost of equity.  He based this on the following five risks associated with Mothers Lounge that he did not believe were adequately accounted for: (1) the terminable nature of the Destination Maternity contract, which accounted for 20% of Mothers Lounge's sales; (2) possible loss of the Bebe Au Lait lawsuit that would render the business plan useless; (3) limited

**[\*40]** long-term success of the free, just pay shipping model; (4) impact of marital issues on the couple-managed business; and (5) impact of Mothers Lounge's failure to adopt social media.

Mr. Pickett does not explain in his report how he derived the 5% company-specific risk adjustment. When pressed at trial, he failed to set forth sufficient detail to allow us to understand this calculation. In his testimony Mr. Pickett highlighted that the loss of the Destination Maternity contract would cut sales by 20%. He further explained that loss of the Bebe Au Lait lawsuit could shutter operations, in which case Mothers Lounge would be merely a collection of assets. He estimated that a 5% company-specific risk adjustment would decrease the company value by 19%, which he thought was reasonable.

We find this explanation wholly deficient to gauge the reliability of Mr. Pickett's calculations. He failed to explain three of the specific risks that he mentioned in his report. We would also expect that Mr. Pickett would qualify each risk by the probability of the risk's occurring. Given these deficiencies in his explanation of the calculation of the company-specific risk, we reject Mr. Pickett's calculation. *See Estate of Davis*, 110 T.C. at 538 ("The persuasiveness of an expert's opinion depends largely upon the disclosed facts on which it is based."); *Rose v. Commissioner*, 88 T.C. 386, 418 (1987), *aff'd*, 868 F.2d 851 (6th Cir. 1989). In any event, we are not satisfied that Mr. Pickett's company-specific risk adjustment accounts for only risks that have not been considered elsewhere in the determination of Mothers Lounge's value.

To determine the weighted average cost of capital, we will apply a cost of equity of 18%. Because Mothers Lounge has no debt, the weighted average cost of capital is equal to the cost of equity at 18%.

C.    *Terminal Value*

Next we must determine the appropriate terminal value of Mothers Lounge after Mr. Pickett's discrete forecast through 2019. As noted above the terminal value estimates the indefinite income stream beyond the projected future cashflows. *See Estate of Jackson*, T.C. Memo. 2021-48, at \*160; *BTR Dunlop Holdings, Inc. & Subs.*, T.C. Memo. 1999-377, slip op. at 17–18. It is calculated by forecasting the cashflows in perpetuity at a specific growth rate and then discounting this value back to the present value. *See BTR Dunlop Holdings, Inc. & Subs.*, T.C. Memo. 1999-377, slip op. at 17–18.

**[*41]** Many of these variables follow the preceding forecasting analysis. Again, we will accept Mr. Pickett's calculations as they relate to the forecast of future sales and cash available for distribution. The discount rate that will be applied will be the 18% from Mr. Mitchell's report. The only remaining disagreement between the experts is the residual growth rate to apply to the stream of income. Mr. Mitchell selected a long-term growth rate of 2% and Mr. Pickett selected a long-term growth-rate of 3%.

Mr. Pickett based his long-term growth rate on the long-term GDP growth rate. He justified this selection because Mothers Lounge could not be expected to grow indefinitely. Instead, it is more likely that Mothers Lounge would grow only with the economy. Mr. Mitchell based his long-term growth rate on inflation. Notably, Mr. Mitchell's adoption of this growth rate represents a diversion from his negative growth rates at the end of the forecasted period. Other than a conclusory statement in his report, Mr. Mitchell does not explain why he selected inflation as Mothers Lounge's long-term growth rate. Therefore, we do not find his analysis persuasive, and we adopt Mr. Pickett's long-term growth rate of 3%.

D.    *Nonoperating Assets*

After calculating the business's value under the discounted cashflow method, we add nonoperating assets to the value. *See Estate of Maggos*, T.C. Memo. 2000-129, slip op. at 30. Excess cash is treated as a nonoperating asset. *Estate of Renier*, T.C. Memo. 2000-298, slip op. at 19. Excess cash is defined as the amount by which cash and short-term investments exceed a business's working capital needs. *Id.* Working capital includes cash on hand, receivables, inventory, and other current assets less accounts payable and other current liabilities. *Estate of Maggos*, T.C. Memo. 2000-129, slip op. at 35 n.23.

Mr. Pickett and Mr. Mitchell agree that the cash on hand exceeded Mothers Lounge's working capital needs as of the valuation date. However, they disagree on the metric we should use to calculate the working capital needed to support operations. Mr. Pickett calculated working capital as a percentage of sales with reference to the historic working capital demands. He examined historic cash levels in relation to sales and determined a normalized cash level based on industry standards. He determined that Mothers Lounge generally required a working capital of 10.5% of sales, or $2,878,489. This resulted in excess cash of $1,351,978. In his rebuttal report Mr. Mitchell

[*42] attacks this value as excessive when considering Mothers Lounge's distribution history, including an over $3 million distribution in the prior year.

In contrast, Mr. Mitchell calculated working capital as a percentage of assets, using data from the Risk Management Association. He estimated that Mothers Lounge required $322,458 in working capital, which resulted in excess cash of $2,216,027. Mr. Mitchell then reduced the value of this excess cash by 10% to account for a lack of control. In his rebuttal report, Mr. Madsen argues that calculating the working capital requirements as a percentage of assets is not explained and the industry data is based on businesses significantly different from Mothers Lounge.

We believe Mr. Mitchell's estimate of working capital significantly understates Mothers Lounge's working capital needs. He did not explain why we should estimate working capital on the basis of Mothers Lounge's assets. Mothers Lounge maintained few assets other than inventory. It neither manufactured the products nor made any significant alterations to the products. Instead, Mothers Lounge maintained a minimal warehouse from which it could ship the products to the end-consumer. The bulk of Mothers Lounge's current expenses is inventory purchases. Therefore, we believe the better estimate of Mothers Lounge's current expenses is one based on sales rather than assets.

This is exactly the approach Mr. Pickett took. He determined that the appropriate estimate of working capital was 10.5% of sales on the basis of historic sales and industry average cash balances. We believe this is a reasonable estimate. Thus, we accept Mr. Pickett's excess cash analysis and hold that Mothers Lounge had excess cash of $1,351,978.

VI.  *Value of Interests in Mothers Lounge*

Now that we have determined the value of Mothers Lounge as a whole, we must determine the values of the interests transferred by petitioner. In addition to allocating the value corresponding to ownership percentage, we may consider control and marketability discounts. The experts agree that both these discounts are warranted in valuing the interests in Mothers Lounge. We regularly accept these discounts when valuing stock of a closely held corporation. *See Estate of Newhouse*, 94 T.C. at 249. While we consider these discounts separately, we acknowledge that there is significant overlap. *See Estate of Jung*,

[*43] 101 T.C. at 434; *Estate of Gallagher*, T.C. Memo. 2011-148, slip op. at 47.  We apply the control discount to the value of the business before the marketability discount.[12] *Estate of Gallagher*, T.C. Memo. 2011-148, slip op. at 47.

A.    *Control Discount*

The control discount reflects the minority shareholder's inability to compel liquidation to realize a pro rata share of the business's net assets and to participate in the management of the company.  *See Estate of Newhouse*, 94 T.C. at 249; *see also Estate of Andrews v. Commissioner*, 79 T.C. 938, 953 (1982) ("The minority shareholder discount is designed to reflect the decreased value of shares that do not convey control of a closely held corporation.").

Mr. Mitchell selected a 10% control discount that he applied only to nonoperating assets.  Mr. Mitchell justified this 10% discount because of the liquid nature of the assets with little to no diminution in value upon distribution.  He failed to provide any additional information as to his selection of the 10% discount nor the underlying data.  We easily reject this discount value.  Not only was this discount not supported in the record, but Mr. Mitchell also improperly restricted the application of the discount to nonoperating assets.  The control discount considers a shareholder's ability to receive a share of the *total* net asset value.  *See Estate of Newhouse*, 94 T.C. at 249.  Therefore, we reject Mr. Mitchell's application of the control discount to only nonoperating assets.  *See Estate of Heck v. Commissioner*, T.C. Memo. 2002-34, slip op. at 42–43.

Mr. Pickett determined a 5% discount for lack of control.  In deriving this figure, he started with the operating agreement in effect as of the valuation date.  The operating agreement delegates all power to conduct the day-to-day operations of Mothers Lounge to the manager, who is elected by the members.  The manager also has the sole authority to control distribution.  Considering this information, Mr. Pickett determined that a control discount was appropriate.  He then reviewed the Mergerstat Control Premium Study, which reports control premiums for transactions prior to the valuation date.  He limited the results to catalog and mail-ordering houses and direct selling establishments in the United States.  Excluding negative control

---

[12] The parties mistakenly equate Mr. Pickett's 5% minority discount and 25% marketability discount and Mr. Mitchell's 30% marketability discount.  Instead of adding Mr. Pickett's discounts together, we must apply them successively, which results in a combined discount of 28.75%.

**[*44]** discounts, he calculated a possible range of 2.88% and 62.79% with an average discount of 27.41%. From this range, Mr. Pickett selected a discount of 5% because a portion of the control discount was likely previously accounted for in the earnings calculation and because of the strong history of distributions. We find Mr. Pickett's control discount to be reasonable and will apply a 5% control discount.

B.    *Marketability Discount*

The marketability discount reflects the fact that there is no readily available market for the shares of closely held corporations. *See Estate of Newhouse*, 94 T.C. at 249; *Mandelbaum v. Commissioner*, T.C. Memo. 1995-255, 1995 WL 350881, at *11, *aff'd*, 91 F.3d 124 (3d Cir. 1996) (unpublished table decision). We consider a nonexhaustive list of factors in determining the appropriate marketability discount: (1) the cost of a similar corporation's public and private stock; (2) an analysis of the subject corporation's financial statements; (3) the corporation's dividend-paying capacity, its history of paying dividends, and the amounts of its prior dividends; (4) the nature of the corporation, its history, its position in the industry, and its economic outlook; (5) the corporation's management; (6) the degree of control transferred with the block of stock to be valued; (7) any restriction on the transferability of the corporation's stock; (8) the period for which an investor must hold the subject stock to realize a sufficient profit; (9) the corporation's redemption policy; and (10) the cost of effecting a public offering of the stock to be valued. *Mandelbaum v. Commissioner*, 1995 WL 350881, at *11; *see also Estate of Gilford*, 88 T.C. at 60; *N. Tr. Co. v. Commissioner*, 87 T.C. 349, 383–89 (1986).

Mr. Pickett applied a 25% marketability discount to the interests. He began his analysis by reviewing pre-intial public offering and restricted stock studies. These studies indicated a mean marketability discount of 21.1%. Mr. Pickett then considered the Stout Restricted Stock Study and associated calculator. This approach considered Mothers Lounge's financial records and derived a marketability discount based on similarly situated companies. The calculator produced a range between 12.5% and 23.1%. He also calculated a private equity discount of 43.3%. To determine where in this range Mothers Lounge should fall, Mr. Pickett considered the ten factors set forth above. Of all the factors, he determined that only Mothers Lounge's history of consistent distribution payments warranted a decrease in the marketability discount. He also ignored the cost associated with going public because Mothers Lounge was unlikely to go

[*45] public. All the other factors he thought warranted an increase in the marketability discount. Considering these factors and his calculations, Mr. Pickett selected a marketability discount of 25%.

Mr. Mitchell applied a 30% marketability discount to the interests. He calculated this discount using the option pricing model, which considers liquidity, holding period, and financial history. As part of this calculation, Mr. Mitchell used the average cashflow yield from his forecast. He also reviewed several studies related to restricted stock and determined that the studies supported a marketability discount between 20% and 35%. To select the appropriate discount, Mr. Mitchell considered Mothers Lounge's average operating performance, high expectations of cash distribution, lack of control, limited possibility of sale, and lack of restrictions on transferability.[13] With these factors, he determined a 30% marketability discount rate.

Both experts set forth a detailed explanation as to the method used to derive the marketability discount. We find Mr. Pickett's methodology slightly more persuasive. In establishing his range, Mr. Pickett based the estimates on companies similar to Mothers Lounge. In contrast, Mr. Mitchell expressly did not make such adjustments. We are also concerned as to Mr. Mitchell's reliance on his cashflow forecasts, which we earlier rejected. Therefore, we adopt Mr. Pickett's 25% marketability discount.

CONCLUSION

We accept the forecasts put forth by Mr. Pickett as they relate to the discrete period of operation and terminal value, including his tax affecting analysis. We also accept Mr. Pickett's calculation that Mothers Lounge had excess cash of $1,351,978. We accept Mr. Mitchell's discount rate of 18% that will be used to calculate the present value of the cashflows from the discrete period of operation and the terminal value. Finally, we accept Mr. Pickett's 5% control discount and 25% marketability discount.

---

[13] It appears Mr. Mitchell incorrectly reviewed the Second Amended Operating Agreement. The First Amended Operating Agreement was in effect at the time of the transfer and provided that an owner could not transfer an interest without unanimous consent.

**[\*46]**  To reflect the foregoing,

*An appropriate order will be issued, and decision will be entered* under Rule 155.